UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:

11 EAST 36TH LLC,

Debtor.

-----------------------------------------------------------------x

Hearing Date and Time:
September 17, 2013 @ 10:00 a.m.

Chapter 11

Case No. 13-11506 (JMP)

## MOTION TO COMPEL ASSUMPTION OR REJECTION OF THAT PORTION OF A PRE-PETITION CONTRACT RELATING TO THE SALE OF DEBTOR'S 2.8% INTEREST IN TWO COMMERCIAL CONDOMINIUM UNITS

Munitalp Corporation ("Munitalp"), as and for its motion to compel 11 East 36th LLC (the "Debtor") to assume or reject that portion of a pre-petition contract relating to the sale of the Debtor's 2.8% interest in two commercial condominium units, pursuant to 11 U.S.C. § 365(d)(2) respectfully states and alleges as follows:

### PRELIMINARY STATEMENT

1.      As the Court is aware, the Debtor, as sponsor, retains a 2.8% interest in two commercial condominium units (101 and 102) (the "Commercial Units") being sold by the secured creditor (11 East 36 Note Buyer LLC) (the "Lender") in connection with a liquidating plan (the "Creditor's Plan") promulgated in the related Chapter 11 case of Bay Condos, LLC ("Bay Condos").

2.      Contemporaneously herewith, the Lender has moved in the Bay Condos case to determine the rights of New York Pub, Inc. ("Gingerman") so as to be in a position to obtain entry of a confirmation order and close on the sale of Bay Condos' majority 97.2% interest in the Commercial Units (ECF No. 110). The Lender has also

moved to vacate the automatic stay in this case, so that it may proceed with the foreclosure of its mortgage or judgment liens against the Debtor/Sponsor's interest in all of the residential and commercial condominium units.

3.      Given the confluence of events, it is an appropriate time to also address Munitalp's rights under the pre-petition contract, as amended, to purchase the Commercial Units.  While Bay Condos likely can no longer sell its 97.2% interest to Munitalp, the Debtor remains a separate signatory of the agreement and has a separate obligation to sell its 2.8% interest to Munitalp regardless of the disposition of the majority interest.  That part of the agreement relating to the 2.8% interest of the Debtor survives as an executory contract unto itself, with a proportionate purchase price of $175,000[1].

## BACKGROUND FACTS

4.      The bankruptcies arise out of a condominium conversion at 11 East 36th Street, New York, NY.  The unsold condominium units (including residential and commercial units) are controlled by the Bobker family through three real estate holding entities, Bay Condos, Morgan Lofts, LLC and the Debtor, all of which have now filed separate Chapter 11 cases in this Court.

5.      After Bay Condos filed its petition on December 22, 2011, it offered for sale the Commercial Units which are leased to a bar/restaurant, Gingerman and a dry cleaning store, respectively.  The Commercial Units are owned as tenants in common by

---

[1] The purchase price is computed as follows: 2.8% of $6,250,000 = $175,000 so as to give the Debtor's estate the benefit of Munitalp's higher offer.

Bay Condos and the Debtor in the following percentages: 97.2% (Bay Condos) and 2.8% (the Debtor) (jointly, Bay Condos and the Debtor are the "Co-Owners").

6.      By initial contract dated August 24, 2012 (the "Contract"), Munitalp agreed to purchase the respective Co-Owners' combined 100% right, title and interest in Unit 101 only for the sum of $4,275,000.

7.      The initial sale hearing was suspended after a dispute arose between Bay Condos and its mortgagee, 11 East 36 Note Buyer LLC (the "Lender"). Thereafter, the Lender filed the Creditor's Plan, pursuant to which it proposed to sell only Bay Condos' 97.2% interest in both Commercial Units 101 and 102.

8.      Weeks prior to confirmation hearing, Munitalp entered into a First Amendment to the Contract, dated March 24, 2013 (the "Amended Contract"), pursuant to which the Co-Owners agreed to sell, and Munitalp agreed to purchase, 100% of both Commercial Units 101 and 102, for the total price of $5,600,000. Munitalp is the only entity that has a contract with the Debtor/Sponsor to purchase any interest in the Commercial Units. A copy of the underlying Contract and First Amendment are collectively annexed hereto as Exhibit "A".

9.      At the ensuing auction conducted by the Lender, Munitalp increased its offer to $6,250,000 for both Commercial Units, while a bid of $6,075,000 was received by the Lender from Dishi and Sons ("Dishi") to purchase only Bay Condos' 97.2% interest in Commercial Units 101 and 102.

10.     After a hearing on May 9, 2013, this Court orally confirmed the Lender's third amended liquidating plan and accepted the bid from Dishi. A

3

confirmation order has not yet been entered due to evolving issues arising out of the rejection of the so-called Gingerman lease.

11.     Specifically, a dispute exists between Dishi, the Lender and Gingerman concerning the treatment of Gingerman's possessory rights as a tenant under a rejected lease within meaning of 11 U.S.C. § 365 (g) and (h).  As noted, a motion to determine the possessory rights of Gingerman was filed by the Lender in the Bay Condos Chapter 11 case, and is scheduled for September 17, 2013.

12.     In the meantime, the Lender pursued a judgment foreclosure against this Debtor.  On May 8, 2013, the Debtor responded by filing the Chapter 11 case to stay a scheduled judgment sale.

13.     The Lender has moved to vacate the automatic stay so as to conclude the judgment sale.  This motion also is returnable on September 17, 2013.

## THE COURT SHOULD COMPEL
## THE DEBTOR TO MAKE AN ELECTION

14.     Although Bay Condos' 97.2% interest in the Commercial Units has been auctioned, the Lender has repeatedly indicated the remaining 2.8% interest was never part of the sale. Thus, that portion of the Amended Contract survives as a separate and divisible pre-petition executory contract subject to assumption or rejection by this Debtor.

15.     The Debtor cannot divorce itself from its pre-petition contractual arrangements simply because Bay Condos did not sell the 97.2% interest to Munitalp.

4

16.     Although it was the goal of Munitalp to purchase 100% of the combined interests, there is nothing to indicate that the Debtor's obligations are not divisible. Thus, Munitalp remains under contract with the right to purchase the Debtor's 2.8% interest in the Commercial Units.

17.     Pursuant to Section 365(d)(2) of the Bankruptcy Code, a debtor-in-possession has until confirmation to assume or reject an executory contract, unless the Court, "on the request of any party to such contract . . . order[s] the [debtor] to determine within a specified time whether to assume or reject such contract . . . ."

18.     By this motion, Munitalp seeks the entry of an order to compel the Debtor to make an election and assume the Amended Contract as it relates to 2.8% interest in the Commercial Units or reject the same, whereupon Munitalp shall be entitled to a rejection claim under Section 365 (i) and (j).  The election will give Munitalp and all other parties in interest certainty regarding final disposition of the whole of Commercial Units.  Moreover, Munitalp's request also plays into the motion of the Lender since Munitalp recognizes the continuing possessory interest of the Gingerman lease.

## LEGAL ANALYSIS

19.     As the Hon. Arthur Gonzalez noted in In re Enron Corp., 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002), the Bankruptcy Code affords a debtor time to determine whether to proceed with executory contracts and unexpired lease, but "the breathing space afforded to the debtor for the assumption or rejection of executory contracts is not without limits."

5

20.     Beginning with an early case under the Bankruptcy Code, In re Theatre Holding Corp., 681 F.2d 102, 105 (2d Cir.1982), the Courts in the Second Circuit have developed a list of the numerous factors which should be considered when a party to an executory contract or unexpired lease seeks to shorten the debtor's time to assume or reject.   See also, In re Burger Boys, 94 F.3d 755, 760 (2d Cir.1996); In re Teligent, Inc., 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001); In re Beker Industries Corp., 64 B.R. 890, 897 (Bankr. S.D.N.Y. 1986).

21.     As enumerated by the Hon. Allan Gropper, these factors include:

1)     the nature of the interests at stake;
2)     the balance of hurt to the litigants;
3)     the good to be achieved;
4)     the safeguards afforded to the litigants;
5)     whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;
6)     the debtor's failure or ability to satisfy post-petition obligations;
7)     the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;
8)     the importance of the contract to the debtor's business and reorganization;
9)     whether the debtor has sufficient time to appraise its financial situation and the potential value of the assets in formulating a plan;
10)    whether there is a need for judicial determination as to whether an executory contract exists;
11)    whether exclusivity has been terminated; and
12)    "above all", the purpose of Chapter 11, to permit successful rehabilitation of debtors.

In re Adelphia Communications Corp., 291 B.R. 283, 288-302 (Bankr. S.D.N.Y. 2003).

22.     Virtually all of the factors weigh in favor of shortening the Debtor's time to make an election regarding Munitalp's residual contractual rights.   Munitalp is ready to close on the sale of the Debtor's 2.8% interest in the Commercial Units only and

has already tendered a down payment of $213,750.00 on the entire sale. This deposit continues to be held by the Debtor's counsel and is in an amount more than the allocable purchase price.

23.    Considering that Munitalp has served as the de facto stalking horse for more than one year, it should not be consigned to a perpetual state of limbo. If the sale transaction with Munitalp is to be rejected, let the Debtor do so now so Munitalp may pursue and liquidate a rejection claim.

24.    Moreover, disposition of the remaining 2.8% may also be an important issue in the Bay Condos Chapter 11 case. The interests of the Lender, Gingerman and Dishi cannot be finally determined until there is clarity with respect to Munitalp's rights and claims.

25.    Munitalp submits that factor one (nature of interests), factor two (balance of hurt), factor three (good to be achieved), factor four (safeguards), factor five (derogation of Bankruptcy Code), factor eight (importance), factor nine (sufficient time to analyze), factor ten (need for judicial intervention), factor eleven (exclusivity) and factor twelve (catch-all) all favor granting the instant motion. In short, there is a clear benefit to the Debtor for an expeditious resolution of the Munitalp's contractual rights, while the sale of the Debtor of 2.8% interest is important to the reorganization of both the Debtor and Bay Condos.

WHEREFORE, Munitalp respectfully prays for the entry of an Order

consistent with the foregoing, together such other and further relief as may be proper.

Dated: New York, NY
       September 3, 2013

                    Goldberg Weprin Finkel Goldstein LLP
                    Attorneys for Munitalp Corp.
                    1501 Broadway, 22nd Floor
                    New York, NY 10036
                    (212) 301-6944

By:                         
                    Kevin J. Nash, Esq.

## PURCHASE AGREEMENT FOR COMMERCIAL UNIT
### (To be executed in Triplicate)

Agreement (this "Agreement") made and dated as of August 24th, 2012, between BAY CONDOS, LLC, a New York Limited Liability Company and 11 EAST 36th LLC, having their offices at c/o 11 East 36th, LLC, 11 East 36th Street, New York, New York 10016 (hereinafter called "Seller"), and MUNITALP CORP., a New York corporation having its office at c/o The Goldberg Group, 1 North Broadway, Suite 400, White Plains, New York 10601 (hereinafter called "Purchaser").

### RECITALS

(1)

a.  The name of the Condominium is The Morgan Lofts Condominium.

b.  The address of the property is 11 East 36th Street, New York, New York 10016, and being described on Exhibit A attached hereto (the "Property").

c.  The Commercial Unit covered by this Agreement is Unit 101 in the Property, being designated and described as the Commercial Unit in that certain Declaration dated November 22, 2006 (which Declaration, together with all amendments thereto are hereinafter, collectively, the "Declaration"). The Commercial Unit is also designated as Tax 866 in 1202 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York.

The Common Interest appurtenant to the Commercial Unit is 7.26%, which interest shall be deemed to include Seller's right, title and interest in any limited   Common   Elements attributable to or used in connection with the Commercial Unit.

d.  Seller hereby agrees to sell, assign and convey to Purchaser and Purchaser agrees to purchase from Seller good, marketable and/or insurable fee title to the Commercial Unit.

The purchase price for the Commercial Unit is:   $4,275,000.00
The down payment paid herewith is:   $213,750.00
The balance of the purchase price is:   $4,061,250.00

e.  Purchaser's principal place of business is c/o The Goldberg Group, 1 North Broadway, Suite 400 White Plains, New York 10601.

      f. Purchaser's    Federal    Employer    Identification    Number    is:

    _____

(2) <u>The Offering Plan</u>. Purchaser acknowledges having received and read a copy of the Offering Plan for The Morgan Lofts Condominium and all amendments thereto, if any, filed with the Department of Law of the State of New York (hereinafter, collectively, referred to as the "Plan") no later than 5 business days subsequent to Purchaser's signing this Agreement. If Purchaser has not received the Plan and all amendments thereto no later than 5 days subsequent to Purchaser's signing this Agreement, Purchaser shall have the right to rescind this Agreement, by sending written notice of such rescission to Seller by certified or registered mail, return receipt requested, or by personal delivery, in either case within 5 days from the date Purchaser delivers an executed Purchase Agreement together with the required Deposit to Seller. Purchaser acknowledges and agrees that the Plan may be amended from time to time by Seller, and any such amendment shall neither excuse Purchaser from performing any of its obligations hereunder nor entitle Purchaser to any abatement in the Purchase price. Any such amendments (i) may be made without Purchaser's consent or approval, except as otherwise provided in "Changes in Prices or Units" or other provisions of the Plan, provided that same shall not affect the Commercial Unit, shall not modify the Common Interest appurtenant to the Commercial Unit and shall not have an adverse effect on the Commercial Unit or the value thereof, and (ii) shall not entitle Purchaser to a right of rescission, except as set forth in the Plan. The Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Agreement and the Plan, the provision of the Plan will govern and be binding. Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Declaration, By-laws and Rules and Regulations contained therein) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Seller. Notwithstanding anything contained herein to the contrary, Purchaser acknowledges that the filing of an amendment to the Plan is required before consummating the transaction contemplated herein (the "Amendment").    As such, the transaction contemplated herein is subject to the Attorney General accepting the Amendment for filing. Seller agrees to submit the Amendment for approval within 30 days of the date hereof. In the event the Amendment is not approved by the Attorney General within 45 days of the submission of same, Seller (and Seller only) may terminate this Contract by sending a written notice. Purchaser shall then be entitled to the return of his deposit and no further obligations on the Seller shall remain.    Notwithstanding the preceding sentence, if Seller sends such written notice of termination, Purchaser may elect in writing, within two (2) business days of receipt of Seller's notice, to close this transaction without such approval (the "Purchaser Election") and shall deposit $10,000 with the escrow agent for Seller's use towards any potential claim or loss incurred in connection with same. Seller shall return any unused part of this additional deposit after (12) months from closing.    Additionally, the sale is also conditioned upon the Seller obtaining recognition under the Bidding Procedures Order finding that paragraph 6 of the rider to the Unit Deed is an unenforceable ipso

2

facto claims and is not binding on the Purchaser. If recognition is not obtained, then Purchaser may terminate the Agreement and obtain a return of the deposit.

(3) Closing of Title: Adjustments. The Closing of Title (the "Closing of Title") shall be **Time of the Essence** and shall take place at the offices of Seller's attorney, or such other place as Seller shall designate, or, at Purchaser's request, at the offices of Purchaser's lender or its attorneys in the New York metropolitan area at 10:00 am no later than 30 days from (i) entry of a final order confirming a plan of reorganization providing for a sale of Property pursuant to this Agreement or entry of a final order (the "Sale Order") of the Bankruptcy Court providing for a sale of the Property under 11 U.S.C. §363(b) and (f); or (ii) approval by the Attorney General of the Amendment or the Purchaser Election, whichever is later. Purchaser may elect to close earlier.

The term "Closing Date" or "closing of title" or words of similar import, whenever used herein, shall mean the date designated by Seller on which the deed to the Unit is delivered to Purchaser, or any adjourned date filed by Seller pursuant to Section 3 hereof.

(4) Closing Costs and Adjustments.

    a.  The obligation to pay to the taxing authority, at the Closing of Title actual New York State and New York City transfer taxes, recording and filing charges and any processing fee and legal fees, if any, of the Condominium's attorney in connection with the sale, and any and all flip taxes, transfer or interest fees or similar charges, if any, payable to the Condominium or otherwise to the benefit of the Condominium unit owners, which arise by reason of the sale shall be paid by Seller. Purchaser agrees to pay fees and charges associated with Purchaser obtaining a mortgage from a lender, title charges and the costs and expenses of Purchaser's counsel.

    b.  Purchaser will adjust with Seller collected rent, real estate taxes, common charges and prepaid utility costs based upon the last bills rendered for such charges. All prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the day of the Closing and based upon the actual number of days in the month and a 366-day year. On the Closing Date, Seller and Purchaser agree to use reasonable efforts to calculate all adjustments required under this Section 4.

(5) Escrow of Deposit.

    a.  Seller and Purchaser hereby designate AJ Gallo Associates, PC, as "Escrow Agent" to receive and hold, subject to the provisions of this paragraph the down payment delivered by Purchaser.

    b.  On closing of title in accordance with this Agreement, Escrow Agent shall

promptly deliver the down payment to Seller or disburse same at Seller's direction.

c. On receipt by Escrow Agent of a statement executed by one of the parties herein (Purchaser, Seller or their successors or assigns) on or after the closing date that the title to the premises has not closed under this Agreement because of a default by the other party or because of the other party's inability to convey title to the Premises in accordance with the provisions of this Contract, Escrow Agent shall, within two (2) business days, deliver a copy of said statement to the other party and return said Deposit to the party requesting return of said down payment on the fifth (5th) business day after receipt by Escrow Agent of said statement unless Escrow Agent, prior to such return, receives from the other party a statement contesting the accuracy of the requesting party's statement and demanding retention of said deposit by Escrow Agent. On receipt of such a statement demanding retention, Escrow Agent shall then release the down payment only on receipt of a statement executed by both parties directing the release of the down payment.

d. Escrow Agent shall also release the Deposit on receipt of a statement executed by one party directing payment of the Deposit to the other party.

e. Notwithstanding anything herein to the contrary, Escrow Agent may at any time and with notice to the parties, surrender the deposit to a court of competent jurisdiction for such disposition as may be directed by such court.

f. Upon delivery of the down payment to either party or a court of competent jurisdiction under and pursuant to the provisions of this paragraph, Escrow Agent shall be relieved of all liability, responsibility or obligation with respect to, or arising out of, the down payment and any and all of its obligations arising therefrom.

g. Escrow Agent, in connection with its performance in such capacity, shall not be liable to either party. In addition, it is agreed that any and all escrow deposits whether of the down payment hereunder or for any other purpose thereafter paid hereunder to the Escrow Agent, are being made for the accommodation of the parties hereto and Escrow Agent shall be deemed to be a stakeholder only. In the event any litigation should arise between the parties to this Agreement concerning any such escrow deposit, then the parties hereto do severally and jointly agree to indemnify and save harmless Escrow Agent from the payment of any costs or any other expense that may be involved in said litigation. Escrow Agent may continue to represent the Seller in connection with any litigation. The provisions of this paragraph shall survive the delivery of the deed hereunder.

h. Escrow Agent shall not have any liability or obligation for loss of all or any portion of the down payment by reason of the insolvency or failure of the

4

institute or depository with whom the escrow account is maintained.

    i.  If the anticipated interest to be earned would, in the reasonable estimation of the Escrow Agent, be in excess of $150.00, Escrow Agent shall place the down payment in an interest bearing account at a bank or trust company insured by the Federal Deposit Insurance Corporation (F.D.I.C.). All interest accrued on said down payment shall belong to the Seller, without credit to the Purchase Price, unless Purchaser is entitled to a return of the down payment under the provisions of contract. Seller and Purchaser agree that so long as placed in a bank that is subject o F.D.I.C. jurisdiction, Escrow Agent shall not be responsible as to the selection of the bank or trust company.

(6) Title.

    a.  Purchaser agrees to cause title to the Property to be examined by Royal Abstract or First American Title Insurance Company (the "Title Company") and to direct the Title Company to deliver copies of such title report (the "Title Report") to Seller's attorney simultaneously with the delivery of same to Purchaser.

    b.  If on the Closing Date, Seller is unable to convey to Purchaser title to the Commercial Unit subject to and in accordance with the provisions of this Agreement, Purchaser may terminate this Agreement by written notice to Seller and Escrow Agent delivered on or promptly after the date scheduled for the Closing of Title, in which even Escrow Agent shall promptly repay to Purchaser the down payment together with any interest earned thereon, and Seller shall pay to Purchaser its costs of title, survey and reasonable attorney's fees in connection with this Agreement. This Agreement shall thereupon be deemed cancelled and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those provisions which are intended to survive such termination pursuant to *11 USC Section 363(b) and (f)*. Seller shall be obligated to: (i) satisfy all mortgages and consensual liens; (ii) discharge all liens of a liquidated amount; (iii) pay all fines; and (iv) expend up to $100,000 to remedy other title defects. Seller shall also be obligated to remedy all violations against the Commercial Unit.

(7) <u>Seller's Interim Covenants.</u>

    a.  Seller agrees at its cost and expense to operate, manage and maintain the Property through the Closing Date in the same manner as it has operated, managed and maintained the Property through the date hereof. Seller shall maintain in full force and effect until the Closing of Title its insurance coverage currently maintained. No personal property included in this sale shall be removed from the Commercial Unit unless the same is replaced with items of at least equal quality.

    b.  Seller covenants not to enter into any leases at the Commercial Unit or to amend, renew or extend the Existing Lease.

    c.  Seller shall allow Purchaser and Purchaser's representatives access to the Commercial Unit, the Lease and other documents required to be delivered under this Agreement for the purposes of inspecting same, upon reasonable prior notice during normal business hours.

    d.  Seller covenants and agrees that the following Condominium conditions shall have been satisfied:

        i.  That there shall not be any outstanding written notices to Seller from the Condominium (or its authorized representative).

        ii.  That the Condominium is a valid condominium created pursuant to RPL Art. 9-B and the Title Company will so insure.

(8) <u>Personal Property Included to Sale; Excluded Items</u>. All items currently existing in the unit, which is sold on an "as is" basis as of the date hereof, are included in this sale, and same will be delivered free and clear of all liens and encumbrances, except the lien of the mortgage applied for Purchaser herein. Decorative lighting fixtures, special wood and ceramic tiles, paints, carpeting, built ins, special landscaping, wallpapers, furniture, furnishings, burglar alarm system exhibited in the model unit, if any, excepting those specifically set forth herein or in the Offering Plan, are for display purposes only and are not included in this sale.

(9) <u>Closing Deed; Power of Attorney</u>. The closing deed shall be a Bargain and Sale with covenant against grantor's acts, shall be duly executed and acknowledged by Seller. The expense of same shall be borne by Seller, including the New York State Transfer Tax, and any other transfer taxes which are payable by Seller to the extent not exempt; and shall contain such a description of the premises as shall be acceptable and approved by the lending institution or the title company insuring said lender so as to validly convey under the Condominium Act, the Unit and the undivided interest in the Common Elements referred to herein. At the closing of title, Purchaser agrees to execute and deliver to Seller a Power of Attorney in the form set forth in Part II of the Plan, and such other documents which are reasonably necessary or customary in connection with the conveyance of a Condominium Unit.

6

(10)   Purchaser Bound by Offering Plan.   Purchaser acknowledges receipt of the Offering Plan at least three (3) full business days prior to the execution of this Purchase Agreement, and Purchaser has read and agrees to be bound by the proposed Declaration, By-Laws and Offering Plan of the said Condominium (and the Schedules, Plans and Exhibits attached thereto), all of which are incorporated by reference and made a part of this Agreement with the same force and effect as if set forth in full herein.   Purchaser acknowledges that he is purchasing a Condominium Unit in a Condominium to be formed, and that except as stated in this Agreement (and as set forth in the Declaration, By-Laws and Offering Plan), he has not relied on any representations or other statements of any kind or nature made by Seller or otherwise, including but not limited to any relating to the description, size or dimensions of the Unit or rooms therein, and the estimated common charges or other expense in connection therewith.

(11)   Seller's Failure to Convey.   Seller's liability under this Agreement for failure to complete and/or deliver title for any reasons shall be limited to the (i) return of the money paid hereunder and upon the return of said money, this Agreement shall be null and void and the parties hereto released from any and all liability hereunder at the Purchaser's option, or (ii) Purchaser's rights to seek specific performance or such other action as permitted by law and equity.

(12)   Acceptance of Deed - Full Compliance by Seller of Closing Requirements; Waiver of Jury Trial.   Anything to the contrary herein contained notwithstanding, it is specifically understood and agreed by the parties hereto that the acceptance of the delivery of the deed at the time of the closing of title hereunder shall constitute full compliance by Seller with the terms of this Agreement as to closing requirements. All representations contained in the Offering Plan shall survive delivery of the deed. The parties hereto do hereby agree that trial by jury in any action, proceeding or counterclaim arising out of or from this Agreement is hereby waived.

(13)   Intentionally deleted.

(14)   Intentionally deleted.

(15)   Lien of Deposit; Risk of Loss.   All sums paid on account of this Agreement and the reasonable expense of the examination of the title to the Unit are hereby made liens hereon, but such liens shall not continue after default by Purchaser under this Agreement.   The risk of loss or damage to the Unit, by fire or any other cause, is assumed by Seller until the delivery of the deed.

(16)   Intentionally deleted.

(17)   Intentionally deleted.

(18)   Default by Purchaser.   If Purchaser shall fail to close title pursuant to the terms hereof, then the sole right and remedy of Seller under this Agreement shall be to

7

cancel this Agreement by giving notice to Purchaser and to proceed against Purchaser as provided below. At the expiration of thirty (30) days after the date of giving of the cancellation notice (unless Purchaser shall have theretofore cured his default) this Agreement shall be deemed cancelled, and (i) Seller shall be entitled to the amount due and payable upon execution of this Agreement and any amounts paid hereunder plus all costs incurred for any special work ordered by purchaser, together with interest earned thereon, if any, as and for liquidated damages, (ii) Seller shall have the right to sell the Unit to others as though this Agreement had never been made, and (iii) Purchaser shall not have any further rights against or obligations to Seller, the Condominium, or any Purchaser of the Unit. Whether or not Seller has cancelled this Agreement as provided above, if Seller has not collected the proceeds of any check for any payments due under this Agreement, then Seller may take such actions at law and in equity as may be required in order to collect the same.

(19) <u>Binding Nature Agreement; Non-Assignability; Notice</u>. The parties agree that the Stipulations and Agreement herein contained shall be binding upon them, their respective heirs, executors, administrators and/or assigns. Purchaser agrees that he will not record or assign the Agreement or any of their rights hereunder without the written consent of Seller. Any notice to be given hereunder shall be in writing and sent by certified mail to the parties at the address above given or at such address as either party may hereafter designate to the other in writing. Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement to a limited liability company controlled by purchaser.

(20) <u>Broker</u>. The parties agree that no broker except the broker named below (the "Broker") brought about this sale and Purchaser agrees to indemnify Seller against any claim brought for brokerage based upon Purchaser's Act in dealing with any third party broker.

<u>Name of Broker</u>          Marcus & Millichap Real Estate Investment Services Inc.
                          270 Madison Avenue, 7th Floor
                          New York, NY 10016
                          Attention: Sharon Bands

Subject to Bankruptcy Court approval, with respect to the Brokerage commission due on account of the sale contemplated herein, it is understood that in the event that the property is purchased by a higher bidder not procured by the Broker, the Broker shall nonetheless be paid its commission due hereunder for having procured the "Stalking Horse" bidder and having initiated the within sales transaction.

(21) <u>Purchasers - Agents for Each Other</u>. If two or more persons are named as Purchaser herein, any one of them is hereby made agent for the other in all matters of any and every kind or nature affecting the premises herein or this Agreement.

(22) <u>Real Property Transfer Taxes</u>. To the extent not exempt under 11 USC Section 1146(a), the Seller shall pay transfer tax obligations to the State of New York and

8

New York City transfer taxes, Purchaser and Seller agree to execute at closing of title, three (3) copies each of the Real Property Tax, Form No. TP-584 promulgated by the New York State Department of Taxation and Finance, the New York City Real Property Transfer Tax Return (NYCRPT) and the Equalization Form RP-5217 NYC. This paragraph shall survive the Closing of Title.

(23) Existing Tenancy. The sale of the Unit is subject to that certain Lease Agreement dated June 5, 1995, by and between Eleven East 36th Street Associates as lessor and New York Pub, Inc. as lessee. Purchaser hereby acknowledges that Purchaser has received opportunity to review the Lease Agreement and such other documents pertaining to same, and that Purchaser agrees to accept title subject to the terms and provisions of the Lease Agreement and such other documents affecting same that have heretofore been furnished to Purchaser.

(24)    Entire Agreement. This Agreement states the entire understanding of the parties and Seller shall not be bound by any oral representations and/or Agreements.

SELLERS:
BAY CONDOS, LLC
By: Wadsworth Condos, LLC, Member

By: _____
    Ben Bobker, Manager

11 EAST 36th STREET, LC
By: Madison Condos, LLC

By: _____
    Ben Bobker, Manager

PURCHASER:
MUNITALP CORP.

By: _____
    Name:  Keury J Nash
    Title:  Authorized Agent

X:\OWPC\new data\Georgiana\word\Bay Condos LLC\REDLINE CONTRACT (all comments) 08-22-12.docx

9

## RIDER TO PURCHASE AGREEMENT

This Rider to Purchase Agreement (this "Rider") is made and entered into as of the _____ day of August, 2012 by and between BAY CONDOS, LLC, a New York limited liability company, and 11 EAST 36th Street, LLC, a New York Limited Liability company booth having offices located at 11 East 36th Street, New York, New York 10016 ("Seller") and MUNITALP CORP., a New York corporation, having its office c/o The Goldberg Group, 1 North Broadway, Suite 400, White Plains, New York 10601 ("Purchaser"):

WHEREAS, Seller and Purchaser are concurrently entering into a Purchase Agreement (the "Contract") with respect to the sale of Commercial Unit No. 101 (the "Unit") in the building known as The Morgan Lofts Condominium (the "Condominium") and located at 11 East 36th Street, New York, New York;

WHEREAS, Seller and Purchaser desire to modify and amend the Contract as hereinafter set forth in this Rider, the provisions of this Rider being paramount and the Contract being construed accordingly;

NOW THEREFORE, the parties hereto do hereby agree that the Contract is modified and amended as hereinafter set forth:

1.    Capitalized terms used herein shall have the meanings ascribed to them in the Contract referred to above.

2.    Seller makes the following additional representations, which shall be true on the date hereof and on the date of Closing subject to Bankruptcy Court approval:

(a)    Seller is a limited liability company validly existing in accordance with the laws of the State of New York, and is in good standing and authorized to do business in the State of New York. Seller has the necessary power and authority to consummate the transactions contemplated by this Contract and has, by proper resolutions, duly authorized the execution and delivery of this Contract and the completion of the transactions contemplated herein.

(b)    The execution by Seller of this Contract and the consummation by Seller of the transaction contemplated hereby (i) do not result in a breach of any of the terms or provisions of, or constitute a default, or a condition which upon notice or lapse of time or both would ripen into a default under any indenture, agreement, instrument or obligation to which Seller is a party and (ii) do not conflict with any order, judgment, injunction, award or decree of any governmental body, administrative agency or court affecting Seller or by which this asset is bound.

(c)    The Lease dated June 5, 1995 by and between Eleven East 36th Street Associates, as landlord, and New York Pub, Inc., as Tenant (the "Lease"). A copy of the Lease has been furnished to Purchaser, as is fully identified on *Exhibit D* annexed hereto, represents the sole Lease to the sole Tenant occupying the entire commercial space at the Premises, is true, correct and complete, and has not been amended, modified or supplemented, and defaults thereunder have not been waived. The rent roll attached hereto as *Exhibit D* accurately reflects

the rents (including all additional rent, percentage rents and other charges) currently being charged and collected by the Seller from the Tenant. The Lease is and shall be at the Closing Date in full force and effect as assumed and assigned pursuant to 11 U.S.C. Section 365 and the Tenant shall not be entitled to any rebate, concession, offset, deduction or purchase option, and there shall be no agreement with the Tenant not set forth in the Lease. To the best of Seller's knowledge, no default by the Seller or by the Tenant has occurred under the Lease, and no event, act or omission exists which with notice or the passage of time or both would constitute a default thereunder. The amount of the security deposit received by the Seller is as set forth on said rent roll. There are no required contributions due and payable by Seller to Tenant under the Lease on account of "Tenant improvements" or "allowances" or similar items.

(d)    There is no brokerage or leasing commission or other compensation currently due, nor is there any brokerage or leasing commission that will hereafter be due with respect to the Lease or any extension or renewal thereof.

(e)    In the event of a vacancy by the Tenant, Seller will not enter into a new lease for the subject space and, in the event of a vacancy or default by the Tenant under the Lease, Purchaser will have the right to terminate this Agreement and receive the return of its down payment. Moreover, Seller shall not modify the existing lease.

(f)    The Condominium Offering Plan furnished to Purchaser represents a true, correct and complete copy of the Plan for the subject Premises and has not been amended, modified or supplemented, except as set forth in the Plan. Seller is not in default under the Plan or under the Declaration of Condominium Ownership described therein, except that Seller is in the process of preparing and submitting the Amendment to the Condo Plan as provided in the contract.

(g)    Seller has no knowledge of, nor does Seller have knowledge of the basis for any of the following:

(i)    any assessments by the Condominium on the Unit except as provided herein.

(ii)    any assessments on the Condominium payable in annual installments or any part thereof which has become a lien on the Unit as provided herein.

(iii)    the commencement of any condominium improvements or of any municipal improvement work that might result in any such assessments on the Unit as provided herein.

(iv)    any actual or planned condemnation or taking or similar action in the nature of eminent domain affecting the Premises.

2

    (h) Seller has received no notice of hazardous wastes or substances found on or at the Premises, and has received no notice of a spill or discharge of hazardous wastes or substances on or around the Premises.

    (i) The Commercial Unit is billed 7.26% of the common charges, which charges for the current year are as set forth on Exhibit ____ annexed hereto and made a part hereof.

    (j) (a) Seller owes the Condominium board monies and is currently in litigation with them; (b) the Condominium is not entitled to payment of any kind except for Common Charges, potential legal fees, costs, etc which are in arrears (c) the Condominium board or association has no right of first refusal or other right to acquire the Commercial Unit. The parties acknowledge that there are current common charges due to the Condominium in the approximate amount $40,536.44 which will be paid current by Seller at closing.

    (k) Seller is unaware of the status of any permits, certificates, building, safety, fire and health department approvals, or any other permits, approvals and licenses necessary to operate the Unit as it is being currently operated. Seller is unaware if the space is legally occupied and approved by the Buildings Department. Seller represents that the TCO exists for the building and Commercial Unit as presently constituted. There are no open alteration applications or permits pending with the Buildings Department except for an application to build PH1 and PH2 on the penthouse.

    (l) There are no employees of Seller at the Commercial Unit.

    (m) Seller has not received written notice from any governmental authority that the existing use, maintenance and operation of the Commercial Unit violates any and all presently existing laws, rules, regulations, permits, certificates or ordinances.

    (n) Seller has not filed all State, Federal, County, municipal and City income and expense returns and reports required to have been filed by Seller with respect to the Commercial Unit.

    (o) There are no pending eminent domain or condemnation proceedings against the building or the Commercial Unit or any part thereof and, to Seller's actual knowledge, no such proceedings are presently threatened or contemplated by any authority with the power of eminent domain.

    (p) There are no contracts or other obligations outstanding for the sale, exchange or transfer of the Commercial Unit or any portion thereof, nor does any party have the right of first refusal.

    (q) No hazardous material is maintained, disposed of, stored, released or generated on, under or at the Commercial Unit or any part thereof in violation of applicable law.

    (r) To Seller's knowledge, there are no material structural or other material

3

physical defects in the Commercial Unit or any component or system of the Commercial Unit or the building in which it is incorporated.

(e)     The Tenant under the Lease is not the subject of any case, action or proceeding under any bankruptcy, insolvency or similar law affecting creditors' rights generally.

3.     At the Closing, the Seller shall deliver the following additional documents which shall be satisfactory to Purchaser's attorneys:

(a)     An affidavit of title in usual and customary form.

(b)     An affidavit that Seller is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code, as amended.

(c)     A notice to the Tenant advising the Tenant of the change in ownership of the Premises.

(d)     A notice to the Condominium advising the Condominium of the change in ownership of the Premises.

(e)     A resignation of the Seller's representative of the Board of Managers of the Condominium.

(f)     A Bill of Sale.

(g)     The original of the Lease, or if after best efforts Seller cannot locate an original, a true copy thereof.

(h)     An Assignment of Lease.

(i)     A check or credit to Purchaser in the amount of the security deposit under the Lease.

(j)     An updated rent roll certificate, certified by Seller setting forth all arrears and prepayments of rent, additional rents and security deposits.

(k)     Such customary title affidavits as the Title Company shall reasonably require in order to close the transaction contemplated under this Agreement.

(l)     Exclusive possession of the Commercial Unit subject only to the Lease.

(m)     A limited liability company consent, together with such other documents as the title company may reasonably require in order to insure title.

(n)     A bring-down affidavit that the representations and warranties are true and correct as of the date of Closing.

4

(o)    A tenant estoppel certificate from the Tenant in form and substance reasonably satisfactory to Purchaser's counsel (attached hereto), which shall be deemed accepted if Purchaser does not object in writing within 3 business days of receipt of same. In the event the Tenant is not co-operative the Purchaser shall accept a Seller's estoppel certificate so long as Seller utilizes best efforts to obtain a Tenant estoppel, including issuance of a default notice if Tenant fails to cooperate and the request that the Tenant cooperate with providing the attached estoppel certificate as part of the Bidding Procedures Order.

(p)    A statement by the Condominium or its managing agent that the Common Charges and any assessments then due and payable on the Condominium have been paid to the date of the Closing of Title, which statement shall show no defaults with respect to the Commercial Unit when paid at closing.

(q)    A certificate of liability insurance carried by the Condominium listing the Purchaser as an additional insured with respect to the common areas, and a certificate of property insurance evidencing such insurance as required to be carried by the Condominium under the Plan.

(r)    Such other documents as counsel for the Purchaser may reasonably require, including certified copy of Bankruptcy Court order(s) approving this Agreement.

4.    Purchaser may assign its rights under this Agreement to a limited liability company. Upon such assignment, the purchaser named hereunder shall be relieved of all liability. Notice of such assignment shall promptly be given to the Seller .

5.    In the event there is a mortgage on the Property, Seller shall make its best efforts to arrange for an assignment of the mortgage to any party designated by Purchaser, provided Purchaser pays the reasonable costs and expenses of the holder of the existing mortgage however Seller cannot guarantee the co-operation of the mortgagee.

6.    Seller agrees at any time or from time to time after the Closing to execute, acknowledge as appropriate and/or deliver such further instruments and other documents (and to bear its own costs and expenses incidental thereto) and to take such other actions as Purchaser may reasonably request in order to carry out the intent and purpose of this Agreement; provided, however, that Seller shall not be obligated to incur any expense of a material nature and/or to incur any material obligations in addition to those set forth in this Agreement and/or the respective closing documents.

7.    Seller acknowledges that Purchaser may be acquiring the Premises as part of an IRC Section 1031 Tax Deferred Exchange for Purchaser's benefit. Seller agrees to assist and cooperate in such exchange for the benefit of Purchaser provided Seller shall incur no liability, cost or expense and will execute any and all documents, subject to the reasonable approval of its counsel, as are reasonably necessary in connection with such exchange.

5

8.    Special Provisions Relating To Seller's Bankruptcy Proceeding and Bankruptcy Court Approval.

(a)    This Agreement is subject to Bankruptcy Court approval and entry of an approved order in Seller's Chapter 11 case (Case No. 11-15844(JMP)) approving this Agreement consistent with the following provisions. Seller shall file a motion within five (5) Business Days after the execution hereof, requesting approval of a bidding procedure order (the "Bidding Procedures Order"), which contains the following provisions: (i) authorizing Seller to conduct an auction (the "Auction") of the Property and assumption and assignment of the existing lease with New York Pub Inc., in accordance with the terms of a Bidding Procedures Order to be entered; (ii) setting a date for the Auction; (iii) establishing bidding procedures consistent with this Agreement; (iv) approving the Break-Up Fee of $128,250.00 as described below, and an initial overbid of $4,425,000.00 which is in excess of the Break-Up Fee plus the Purchase Price; (iv) setting a subsequent hearing to approve the sale of the Property pursuant to a mutually acceptable Sale Approval order; and (v) providing that no prospective purchaser shall be permitted to bid at the Auction unless such party has been deemed "qualified" in accordance with certain criteria set forth in the Bidding Procedures Order, which at a minimum shall require any such prospective purchaser to (a) provide documentation establishing such prospective purchaser's ability to meet its commitments pursuant to its bid and establish a matching down-payment, and (b) submit a definitive binding agreement (consistent with this Agreement) which is free of any financing or due diligence contingencies or any other contingencies not contained in this Agreement, and contains terms no less favorable to the Seller than this Agreement; (vi) finding that the provisions of paragraph 6 of the rider to the Unit Deed are unenforceable as an ipso facto clause; and (vii) finding that Tenant shall cooperate in providing the attached estoppel certificate.

(b)    Should there be an Auction and should bidding take place, Purchaser shall have the right, but not the obligation, to participate in the bidding and to be approved as the successful bidder based on a new bid. At the conclusion of the Auction, Seller shall select and recommend for approval to the Bankruptcy Court the highest and best offer for the purchase of the Property and shall ask the Bankruptcy Court to enter the Sale Approval Order. In determining the highest and best bid, the fact that the Break-Up Fee must be paid if the bid of Purchaser is not selected as the highest and best bid shall be taken into account in addition to all brokerage fees to be paid.

(c)    Purchaser shall be entitled to terminate this Agreement and receive an immediate return of the down-payment if the Bidding Procedures Order as provided above or a Sale Approval Order is not entered within sixty days from signing this contract; (i) authorizing and approving the sale of the Property and assumption and assignment of lease to Purchaser in accordance with the terms of this Agreement including, without limitation, providing that such sale and assumption and assignment of lease shall be free and clear of all claims, liens taxes, and encumbrances; (ii) finding that, as of the Closing Date, the transactions contemplated by this Agreement effect a legal, valid, enforceable and effective sale and transfer of the Property and lease to Purchaser, and vest Purchaser with title to the Property and lease, free and clear of all claims, liens, taxes, and encumbrances; (iii) finding that Purchaser is a good faith purchaser

6

entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) approving the notice of the Sale Approval Order as proper and adequate; and (v) providing that if the Property is sold under a confirmed plan of reorganization after confirmation, the transfer of the Property shall be exempt from payment of all transfer and recording taxes otherwise owed to any local or state government units, but if not sold under a confirmed plan, then the Seller is responsible for the payment of all transfer and recording taxes; (vi) finding that the provisions of paragraph 6 of the rider to the Unit Deed are unenforceable as an ipso facto clause.

(d)     If Purchaser is not selected as the highest and best bidder at the Auction, Purchaser shall thereupon be entitled to the immediate return of the Down-payment and shall have no obligation to close in the event that the successful bidder does not close on a purchase of the Property.

(e)     Purchaser shall be entitled to a break-up fee (the "Break-Up Fee") equal to three percent (3%) of the Purchase Price, or $128,250 payable without further order of the Bankruptcy Court and immediately out of the sale proceeds in the event that the Property is sold to any person other than the Purchaser.  Seller's obligation to pay the Break-Up Fee shall constitute an allowed administrative expense.

(g)     All of the terms of this Section 8 hereof shall survive termination of this Agreement and the Closing.

9.     Except as amended by this Rider, the Agreement shall remain unmodified and in full force and effect, and is hereby ratified and confirmed in all respects.


[the remainder of this page has been intentionally left blank]


7

**IN WITNESS WHEREOF**, the parties hereto have caused this Rider to be duly executed and delivered as of the date first above written.

**SELLERS:**
BAY CONDOS, LLC
By: Wadsworth Condos, LLC, Member

By: _____
　　Ben Bobker, Manager

11 EAST 36th STREET, LC
By: Madison Condos, LLC

By: _____
　　Ben Bobker, Manager

**PURCHASER:**
MUNITALP CORP.

By: _____
　　Name: _Kurt Naef_
　　Title: _Authorized Agent_

## FIRST AMENDMENT TO THE CONTRACT

THIS FIRST AMENDMENT TO THE CONTRACT (this "**Amendment**") is made as of the 29th day of March, 2013, by and among Bay Condos LLC and 11 East 36[th] LLC ("**Seller**"), and Munitalp Corp. ("**Purchaser**").

## W I T N E S S E T H:

**WHEREAS**, Seller and Purchaser are parties to that certain Purchase Agreement dated as of August 24, 2012 (the "**Contract**"); and

**WHEREAS**, Seller and Purchase desire to modify certain terms and provisions of the Contract as more particularly set forth herein.

**NOW, THEREFORE**, for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Definitions.** Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Contract.

2.    **First Amendment.**

(a)    **Additional Unit to be Included and Conveyed:**

The Contract is hereby amended to include the additional condominium unit 102, currently occupied by JYA Cleaners, Inc. as part of the defined "Property", pursuant to a written lease (the "JYA Cleaners Lease"), together with all of Seller's right, title and interest in the 1.91% Common Interest and Common Elements appurtenant and attributable thereto. Seller represents that the JYA Cleaners Lease is and shall be in full force and effect, without default and currently expires on October 31st, 2022, without any right of Tenant's renewal, extension or right of first refusal. Seller has an Option to terminate the Lease on October 31st, 2017. Seller further represents that the current rent paid by JYA Cleaners Inc. is $11,013.83 per month.

(b)    **New Purchase Price**

Based upon the inclusion of additional unit 102, the purchase price for the Property is hereby increased from $4,275,000 to $5,600,000, without any additional increase in the Deposit, which remains in the sum of $213,750.

### 3. Deletion of Clause 2 in Contract

Seller agrees to start preparation of an Amendment to the Condo Plan upon Bankruptcy Court approval of the Contract; provided, however, that Attorney General approval of the Amendment shall not be a condition to closing and the closing shall proceed while the approval process is pending.

### 4. Ratification

Except as modified and amended hereby, the Contract remains in full force and effect in accordance with its terms and is hereby ratified and confirmed by each of Seller and Purchaser.

### 5. Bankruptcy Provisions.

All provisions in the Contract regarding the bankruptcy proceedings of Bay Condos, LLC, including provisions regarding bidding procedures, are hereby deleted and replaced with the following:

Purchaser understands that the Seller is currently a debtor in bankruptcy and as such the transaction contemplated hereby may require Bankruptcy Court approval. Purchaser acknowledges that Seller intends to proceed in the Bankruptcy Court or bid at the auction for the Property in an amount to satisfy all allowed outstanding claims in the bankruptcy from the proceeds of this transaction and a new loan being obtained by Seller. In the event Seller is unable to fully satisfy all allowed claims at the time of closing, or the Contract is not approved by the Bankruptcy Court, Seller or Buyer shall have the right to terminate the Contract and Buyer shall be entitled to an immediate return of the Deposit. This sale is further conditioned on Seller's ability to deliver 100% of the ownership in the Property (Units 101 and 102) free and clear of all liens, judgments, taxes and claims. In furtherance of the foregoing, 11 East 36th LLC agrees to assign its 2.8% interest in the Property to Purchaser at the time of closing. The assignment shall be free of all outstanding liens, judgments or claims based upon satisfaction thereof in the event the Bankruptcy Court cannot approve a transfer of 100% of the Property, free and clear under 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5). Purchaser agrees to close no later than 21 days after Court's determination of all claims.

2

6.    **Miscellaneous.**

(a)        This Amendment supersedes any prior agreements or understandings between the parties with respect to the subject matter hereof.

(b)        This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which, taken together, shall constitute one and the same document.

(c)        The parties agree that this Amendment may be delivered by the parties' counsel by facsimile machine or "PDF" to the other party or its counsel and signatures so transmitted constitute original signatures and are binding on the parties so signing. Upon request, the parties shall further deliver between themselves actual originally signed copies of counterparts, but such further delivery or failure thereof shall not affect the validity or timing of this Amendment.

IN WITNESS WHEREOF, the parties have duly executed this Amendment as of the day and year first above written.

SELLER:

**Bay Condos LLC and 11 East 36th LLC**

By: _____
Name: Ben Bobker
Title: Manager

PURCHASER:

**Munitalp Corp.**

By: _____
Name: Kevin Nash
Title: Authorized Signatory